IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| v. ) | Case No.: **CR-04-PT-0087-S** |
| ) | |
| **ERICK RAMONE WILLIAMS** ) | |
| ) | |

ENTERED
NOV - 2 2004

## MEMORANDUM OPINION

This cause comes on to be heard and considered on defendant's Motion for Judgment of Acquittal as to Count Two of the indictment. The court has previously overruled defendant's Motions for New Trial and Judgment of Acquittal as to Count One. Count Two charges the substantive offense of money laundering which allegedly occurred "on or about April 6, 2002." The conspiracy charged in Count One is alleged to have begun "on or about April 2002."

At the trial, contrary to an earlier position of the court, the Government acknowledged that the "proceeds of a specified unlawful activity, that is, the conspiracy to distribute cocaine," was intended to relate only to the conspiracy charged in Count One and not some earlier or different conspiracy. That means that the court cannot consider "proceeds of a specified unlawful activity" that occurred prior to April 2002. Further, it is clear that the $132,000.00 payment referred to in Count Two was the first payment for the drugs delivered with relation to the conspiracy charged in Count One. The $132,000.00 did not come from some earlier conspiracy or substantive offense.

The Government asserts that the money laundering act charged in Count Two involved

1

proceeds created by drug trafficking, including the various acts charged in Count One (drug conspiracy). According to the Government, there is no reason why the financial transactions charged in Count Two might not also be part of the ongoing conspiracy to distribute drugs charged in Count One.

The Government asserts that, in this case, the money laundering was done to promote and further the continuance of the drug conspiracy. The Government argues that the conspiracy was perpetuated by the buying of more cocaine. According to the Government, payment for drugs constitutes promotion under the money laundering statute when the payment encourages further drug transactions. *U.S. v. King*, 169 F.3d 1035, 1039 (6th Cir. 1999); *U.S. v. Baker,* 63 F.3d 1478, 1494 (9th Cir. 1995) (finding that paying supplier for more contraband cigarettes was promotion because defendant could not continue illegal trafficking without paying supplier).

The Government asserts that it proved at trial that Williams paid for the cocaine charged in Count One with the proceeds of prior drug transactions. The Government further contends that it proved that Williams executed the transaction charged in Count Two with the purpose or intent of promoting or continuing the specified unlawful activity of distributing cocaine. According to the Government, it presented evidence through Williams' tax records that the money used for the purchase of the cocaine was drug proceeds. The Government asserts that Williams did not have sufficient legitimate income to make cash payments in the amounts involved here. *See U.S. v. Westbrook*, 119 F.3d 1176, 1191 (5th Cir. 1997) (stating, "[e]vidence that a defendant's cash outflow in a financial transaction exceeds his legitimate income is sufficient to show that the transaction 'involves the proceeds of specified unlawful activity,' even if the defendant claims income from other sources"); *U.S. v. Puig-Infante*, 19 F.3d 929, 940

2

(5th Cir. 1994) (finding evidence that defendant was engaged in drug trafficking and had insufficient legitimate income to produce the money used in the transactions was sufficient to establish that the money was derived from proceeds of drug distribution). The Government argues that the drug conspiracy could not have continued if Williams did not buy more drugs and, therefore, the purchase of the cocaine promoted the conspiracy to distribute cocaine.

Although the Government acknowledges that the "money laundering statute requires the government to prove that money used in the charged transaction was derived from proceeds of illegal activity," the Government argues, "it does not require the government to trace the money to a particular illegal drug transaction." *U.S. v. Hardwell,* 80 F.3d 1471, 1483 (10th Cir. 1996). Further, the Government asserts that it did put forth evidence concerning specific transactions that occurred during the conspiracy time period, and that the jury could infer that the proceeds charged in Count Two were generated from those transactions.

The Government points out that David Salazar testified that he gave the cocaine to Williams at Williams' house located at Meg Drive. Thereafter, Williams left with the cocaine, leaving Salazar waiting at Williams' house. Later Williams returned to his house and paid Salazar the money. The Government argues that this transaction occurred during the time period charged in the conspiracy count and that the jury was free to infer from this evidence that the proceeds Williams paid Salazar were generated after Williams sold the cocaine to someone else.

Additionally, the Government contends that it presented evidence that Williams was being supplied cocaine by individuals other than Salazar. The Government maintains that, during one taped conversation between Salazar and Williams, Williams indicated that he had grown tired of waiting on Salazar to deliver 35 kilos of cocaine and that he was going to get the

3

cocaine from another supplier. According to the Government, the jury was free to infer from this evidence that some of the proceeds charged in Count Two were generated as a result of William's drug dealings with other individuals just prior to the time of the Count Two transaction.

What the Government overlooks is that it agreed at trial that the "conspiracy" referenced in Count Two of the indictment was only the conspiracy addressed in Count One of the indictment and not some other offense. That leaves the question of whether merely paying for the first drugs purchased under the conspiracy charged in Count One can be considered using the "proceeds of a specified unlawful activity." This court concludes that it cannot.

The Eleventh Circuit stated in *U.S. v. Christo,* 129 F.3d 578, 579-80 (11th Cir. 1997):

> <u>Money laundering is an offense to be punished separately from an underlying criminal offense</u>. *United States v. Edgmon*, 952 F.2d 1206, 1213 (10th Cir.1991) (finding that Congress intended money laundering and other specified unlawful activity to be distinct offenses punished separately). The main issue in a money laundering charge, therefore, is determining when the predicate crime becomes a "completed offense" after which money laundering can occur. *United States v. Kennedy*, 64 F.3d 1465, 1477-78 (10th Cir.1995).
> . . .
> Viewing the evidence in the light most favorable to the government, we conclude that these facts are insufficient to establish that Maulden engaged in a monetary transaction that was separate from and in addition to the underlying criminal activity. The check kite did not deprive the bank of anything, nor did Maulden unlawfully obtain something from the bank, until Bay Bank disgorged its funds by the payment of the check to SouthTrust Bank. <u>Thus, the withdrawal of funds charged as money laundering was one and the same as the underlying criminal activity of bank fraud and misapplication of bank funds.</u> We do not accept that money laundering is inherent in bank fraud or misapplication of funds. We do not understand Congress to have been so subtle when it enacted the money laundering statute.

(Emphasis added).

The Seventh Circuit, discussing *Christo*, stated as follows in *U.S. v. Mankarious,* 151

4

F.3d 694, 704-05 (7th Cir. 1998):

> The Eleventh Circuit explained that <u>the money laundering statutes punished transactions in proceeds, not the transactions that create those proceeds</u>. Thus, time is important, but in a different way than Mankarious and Murphy allege. <u>A money launderer must obtain proceeds before laundering can take place.</u>
> . . .
> Similarly, in *United States v. Johnson*, 971 F.2d 562 (10th Cir.1992), the Tenth Circuit considered basically the same problem in a case involving the laundering, also under § 1957, of funds derived from wire fraud. The government identified the wire deposit of funds into the defendant's account as the money laundering transaction. The defendant countered that he could not have engaged in a transaction in criminally derived property because he did not possess the proceeds of wire fraud until after the completion of the wire transfer. The court agreed. Like the *Christo* court, however, the Tenth Circuit used the language of time to express this conclusion: "Whether or not the funds that were wired to the defendant were 'criminally derived property' depends upon whether they were proceeds obtained from a criminal offense at the time the defendant engaged in the monetary transaction. We find they were not." 971 F.2d at 569-70.
> In both *Christo* and *Johnson*, the courts confronted a problem arising out of attempts to define what the money laundering statutes refer to as "proceeds of specified unlawful activity," 42 U.S.C. § 1956, or "criminally derived property," 42 U.S.C. § 1957. <u>Both courts held that money laundering criminalizes a transaction in proceeds, not the transaction that creates the proceeds.</u> Bank fraud does not generate its proceeds until after execution. Wire fraud often does not give rise to proceeds until after a wire transfer. <u>These cases stand for the rule that the predicate offenses must produce proceeds before anyone can launder those proceeds</u>.

(Emphasis added) (Footnotes omitted).

In *U.S. v. Dimeck*, 24 F.3d 1239, 1246-47 (10th Cir. 1994), the Tenth Circuit stated as follows:

> A drug transaction, from a business perspective, consists of the distributor (or kingpin) getting the drugs to his middlemen who in turn either sell the drugs directly or have others conduct the actual street sales. The middlemen then collect the money from either their sellers or the consumer (depending upon whether they conduct the sales themselves) and the middlemen then pay the distributor for the drugs that had been advanced to them. It is not unusual for a middleman to use a courier to deliver the money to, and pick up the drugs from, the distributor. During those transactions, it is not necessary for those involved to conceal or disguise the attributes of the money as it passes from one set of hands to another

5

> because the people expected to handle the money know it is illegal drug money.
>
> In the instant case, the final part of the business deal consisted of <u>transporting the money from Detroit, where the drugs had been sold, to California, so that Pruneda could pay his suppliers</u>. The transportation of the money from Detroit to California in a box, suitcase, or other container does not convert the mere transportation of the money into money laundering. The existence of the money is, of course, concealed so that no explanation whatever need be offered to outsiders as to its attributes. <u>The money laundering statute was designed to punish those drug dealers who thereafter take the additional step of attempting to legitimize their proceeds so that observers think their money is derived from legal enterprises</u>. *Edgmon*, 952 F.2d at 1214; *Garcia-Emanuel*, 14 F.3d at 1474; see also *United States v. Johnson*, 971 F.2d 562, 569 (10th Cir.1992). <u>That extra step is missing in this case</u> with respect to the initial plan to transport the money to Pruneda.

(Emphasis added) (Footnotes omitted).

In *U.S. v. Heaps*, 39 F.3d 479, 485-86 (4th Cir. 1994), the Fourth Circuit stated as follows:

> Here, by contrast, the defendant's only crime was the consummation of the sale of ecstasy, for which he was charged and convicted. The money was picked up at the Western Union office by the defendant's wife, and placed in a box in a drawer at his home. <u>Were the payment for drugs itself held to be a transaction that promoted the unlawful activity of that same transaction virtually every sale of drugs would be an automatic money laundering violation as soon as money changed hands.</u> Understood this way, § 1956 would have such reach that it would criminalize the very same conduct already criminalized by the drug laws. The Tenth Circuit has observed in the context of a *Blockburger* challenge to a money laundering charge:
>> Like the continuing criminal enterprise statute ... <u>Congress appears to have intended the money laundering statute to be a separate crime distinct from the underlying offense that generated the money to be laundered.</u> The senate report on § 1956 expresses the need for a federal criminal offense aimed directly at the activity of laundering the money gained from illegal activity. The Senate report on the money laundering bill makes plain that the bill was intended to create a "new Federal offense against money laundering." Sen. Rep. 99-433 at 4.... Congress aimed the crime of money laundering at conduct that follows in time the underlying crime rather than to afford an alternative means of punishing the prior "specified unlawful activity." Congress enacted the money laundering statute to provide a punishment in addition to other

6

> punishment rather than instead of other punishment. <u>We find that Congress intended money laundering and the "specified unlawful activity" to be separate offense separately punishable.</u>
> 
> *United States v. Edgmon*, 952 F.2d 1206, 1213-14 (10th Cir.1991), cert. denied, 505 U.S. 1223, 112 S.Ct. 3037, 120 L.Ed.2d 906 (1992). Although the Tenth Circuit considered the question in a different context and perhaps placed too much emphasis on the temporal distinction between past and future crimes, its insight into Congress' intention is valuable. Congress intended to prevent an ill other than those already prohibited by other laws. <u>The statute should not be interpreted to make any drug transaction a money laundering crime.</u>

(Emphasis added).

In *U.S. v. Dovalina*, 262 F.3d 472, 476 (5th Cir. 2001), the Fifth Circuit stated:

> <u>In limited contexts, evidence showing that a dealer used the proceeds of drug trafficking to pay for the drugs the dealer sold is sufficient proof of money laundering.</u> See *United States v. King*, 169 F.3d 1035, 1039 (6th Cir.1999); *United States v. Martinez*, 151 F.3d 384, 389 (5th Cir.1998); *United States v. Baker*, 63 F.3d 1478, 1494 (9th Cir.1995); *United States v. Torres*, 53 F.3d 1129, 1137 n. 6 (10th Cir.1995); *United States v. Skinner*, 946 F.2d 176, 177-78 (2d Cir.1991). The evidence must establish that a dealer used the proceeds of an illegal transaction to pay for the drugs. See, e.g., *King*, 169 F.3d at 1039 (affirming money laundering conviction based on evidence that the defendant transferred the proceeds of drug sales to couriers in payment for prior marijuana deliveries). <u>A promotion money laundering offense cannot be established merely by evidence of a single buyer's repeated payments to a distributor</u>. The evidence at trial showed that Dovalina shipped drugs to Serabia and that Serabia paid for the shipments. The Government did not present evidence indicating Dovalina's source of the marijuana or that Dovalina used the proceeds of the transactions to buy more marijuana. While Serabia's payments may have ensured future marijuana shipments, the Government was required to prove that Dovalina used at least part of the proceeds in a subsequent financial transaction with the intent to promote unlawful activity.

(Emphasis added) (Footnotes omitted).

In *U.S. v. Martinez*, 151 F.3d 384, 389 (5th Cir. 1998), the Fifth Circuit stated:

> Christopher and Orozco challenge the sufficiency of the evidence to prove that the money involved in the three money laundering transactions was the proceeds of drug trafficking and that the transactions furthered drug trafficking operations. The appellants claim that the district court misconstrued the elements necessary to sustain a money laundering conviction under 18 U.S.C. § 1956 and erroneously

7

> equated drug purchase money with disposing of unlawful proceeds (money laundering).
>
> The evidence offered at trial indicated that virtually all the money that Christopher possessed was drug money and that the transactions he entered were conducted with the intent to promote the drug trafficking operation. <u>It is the intent to promote the illegal activity, the government argues, that is the decisive element of the money laundering statute. It is clear from the evidence that Orozco knew that Christopher took drugs on consignment and paid for them with money raised from the distribution of the drugs</u>. We agree with the government that from the evidence presented at trial, the jury could readily infer that the substantial amounts of $226,000 and $20,000 involved in Counts 2 and 4, respectively, were knowingly acquired by Christopher in whole or in part from drug trafficking. We find appellants' argument that the drug proceeds were not used to further illegal activities unconvincing. The evidence indicates that illegal proceeds were used to further illegal activities in the instant matter. Because the jury found such evidence convincing, we will not overturn its finding.

(Emphasis added).

In *U.S. v. King*, 169 F.3d 1035, 1039 (6th Cir. 1999), the Sixth Circuit stated:

> Viewing the evidence in the light most favorable to the prosecution, we conclude that a rational trier of fact could have found King guilty of [violating 18 U.S.C.A. § 1956(a)(1)(A)(i)]. First, the record reveals that King coordinated a multi-person drug distribution business. On numerous occasions he conducted financial transactions, transferring money via Western Union to his couriers. Various individuals employed by King in this operation testified at trial about these transactions, and records from Western Union were introduced that documented the transfers.
>
> Second, King had a minimal amount of income from legitimate sources during these years, as evidenced by his income tax returns. These returns listed a gross income of only $27,017.41 for the seven-year period from 1987 to 1993. Because the amounts transferred by wire during this period of time exceeded $15,000, a rational trier of fact could find that the wire transfers involved the proceeds of unreported drug transactions and, given his personal involvement in the business, that King was aware of this source.
>
> Third, a rational trier of fact could find that King intended to "promote" his ongoing drug business. <u>On more than one occasion, King wired funds to his couriers in payment for prior marijuana deliveries. Payment for drugs may constitute "promotion" for the purposes of the money laundering statute when such payment encourages further drug transactions</u>. See, e.g., *United States v.*

8

> *Baker*, 63 F.3d 1478, 1494 (9th Cir.1995) (stating that paying a supplier "promotes" the carrying on of the unlawful activity because the defendant "could not have continued the illegal trafficking without paying his ... suppliers."); United States v. Torres, 53 F.3d 1129, 1137 n. 6 (10th Cir.1995) (finding that using drug money to buy more drugs to be resold at a later time "promotes" the specific unlawful activity); *United States v. Skinner*, 946 F.2d 176, 177-78 (2d Cir. 1991) (holding that payments to drug suppliers "promoted" the ongoing fraudulent scheme).
>
> King cites *United States v. Heaps*, 39 F.3d 479 (4th Cir.1994), in support of his argument that the payment of money for drugs previously delivered on consignment does not constitute "promotion." The facts in *Heaps*, however, are distinguishable from those in the present case. In *Heaps*, the Fourth Circuit held that cash payment for the sale of drugs did not constitute the "promotion" of a drug offense when there was no evidence of a subsequent sale. See *id.* at 484. Unlike *Heaps*, the financial transactions in the instant case were followed by subsequent sales of marijuana. Thus *Heaps* provides no support for King's position.

(Emphasis added).

In *U.S. v. Baker*, 63 F.3d 1478, 1494-95 (9th Cir. 1995), the Ninth Circuit stated:

> Baker challenges his money-laundering convictions. He contends the government presented insufficient evidence to prove he engaged in a financial transaction "with the intent to promote the carrying on" of unlawful activity, as required by 18 U.S.C. § 1956(a)(1)(A)(i). This claim is meritless. The government presented abundant evidence of payments Baker made to the Clinkenbeards for the purchase of contraband cigarettes. Baker could not have continued the illegal trafficking without paying his cigarette suppliers. See *United States v. Montoya*, 945 F.2d 1068, 1076 (9th Cir.1991) (depositing a check in a bank account suffices to satisfy the requirements of section 1956(a)(1)(A)(i) because, without depositing the check, the defendant could not make use of the funds).

(Emphasis added).

In *U.S. v. Skinner*, 946 F.2d 176, 177-78 (2nd Cir. 1991), the Second Circuit stated:

> Appellants' convictions resulted from a series of uncomplicated cocaine sales occurring from July to October, 1989 in Vermont and Alaska. The Government presented evidence at trial showing that the sales proceeded as follows. On several occasions in July and August, Blodgett sent cocaine from Alaska to Skinner in Vermont, by Express Mail. Skinner would then sell the cocaine to purchasers in Vermont, who included a Vermont State Police undercover agent,

9

Sgt. Paul Duquette. To pay Blodgett for the cocaine, Skinner used the proceeds of her sales to purchase U.S. Postal Service money orders totalling [(sic)] $3,320, which she then sent to Blodgett in Alaska. In late August, Blodgett returned to Vermont and thereafter sold cocaine directly to Skinner. Altogether, Blodgett transferred approximately 120 grams of cocaine to Skinner.

First, appellants argue that they were improperly convicted of money laundering in violation of 18 U.S.C. § 1956(a)(1)(A)(i) (1988), because the statute was designed to criminalize financial transactions aimed at concealing the source of proceeds generated from illegal activity. Congress did not intend, they argue, to convert simple payment for illegal drugs into an independent offense. Although appellants' conduct seems to differ from that which we traditionally associate with the term "money laundering", the language Congress used in 18 U.S.C. § 1956(a)(1)(A)(i) shows that it sought to reach conduct that went beyond the concealment of proceeds of criminal activity. Indeed, the words of this provision of the statute, in conjunction with the definitions provided in 18 U.S.C. § 1956(c) (1988), demonstrate that Congress intended to make unlawful a broad array of transactions designed to facilitate numerous federal crimes, including the sale of cocaine.

(Footnotes omitted).

Considering all of the foregoing, this court concludes that the proof under Count Two is not sufficient to establish an offense separate from Count One. The Motion for Judgment of Acquittal as to Count Two will be granted.

This 2nd of November, 2004.

ROBERT B. PROBST
SENIOR UNITED STATES DISTRICT JUDGE